T.C. Memo. 1999-409

UNITED STATES TAX COURT

COMPACT EQUIPMENT COMPANY, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

BERNARD J. ATKINSON AND CAROL S. ATKINSON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 10040-97, 10041-97.    Filed December 16, 1999.

<u>James P. Kleier</u>, for petitioners.

<u>Paul J. Krug</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

VASQUEZ, <u>Judge</u>:  In these consolidated cases, respondent determined the following deficiencies in and additions to

petitioners'[1] Federal income taxes:

| Petitioners | Taxable Period Ending | Deficiency | Additions to Tax | |
|---|---|---|---|---|
| | | | Sec. 6653(b) | Sec. 6661 |
| Compact | 03/31/85 | $23,783 | $11,892* | $5,946 |
| Equipment Co. | 03/31/86 | 247,334 | 123,667* | 61,834 |
| | 05/31/86 | 33,609 | 16,805* | 8,402 |
| Bernard and | 12/31/85 | 209,313 | 104,657* | 52,328 |
| Carol Atkinson | 12/31/86 | 124,851 | 93,638* | 31,213 |

* Plus 50 percent of interest due on portion of underpayment of tax attributable to fraud.

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the issues for decision are: (1) Whether Compact Equipment Co. (petitioner) underpaid its taxes by deducting various payments (made on behalf of its president) as compensation expenses; (2) if petitioner underpaid its taxes, whether the 3-year statute of limitations under section 6501(a) bars respondent from assessing and collecting the underpayment of tax; (3) whether petitioner is liable for fraud additions to tax under section 6653(b); (4) whether Bernard and Carol Atkinson (Atkinsons) are liable for fraud additions to tax under section 6653(b); and (5) whether petitioners are liable for an addition to tax for substantial understatement of tax pursuant to

---

[1] References to petitioners are to Compact Equipment Co., Bernard Atkinson, and Carol Atkinson.

section 6661.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. At the time they filed their petitions, petitioner's principal place of business was in Irwindale, California, and the Atkinsons resided in Carnelian Bay, California.

Bernard Atkinson's Professional Experience in the Automotive Industry

From 1950 to 1959, after graduating from high school, Bernard Atkinson (Atkinson) was employed at an automobile dealership and a finance company specializing in automobile loans. During that time, Atkinson supplemented his practical knowledge of the automobile industry by studying automobile mechanics and dealership management at the General Motors Institute in Flint, Michigan.

From 1959 to 1968, Atkinson worked in General Motor's Pontiac Motor Division as a warranty clerk. In 1968, he continued working in the automotive field by taking a position with Trafco Corp. (Trafco) in Brown, Michigan. Trafco manufactured recreational vehicles. In 1973, Compact Equipment Co., a subsidiary of Trafco located in Southern California, hired

Atkinson as its general manager.[2]  By 1975, due to severe financial losses, Trafco began closing many of its operations and liquidating its subsidiaries.  Seeing an opportunity for financial independence and success, Atkinson purchased Compact Equipment Co.'s assets, incorporated petitioner as BJ Atkinson Co., and contributed the assets to petitioner.[3]  Shortly thereafter, petitioner, which was owned 100 percent by Atkinson, was renamed Compact Equipment Co.  Petitioner, however, conducts its business under the name "Family Wagon".

Petitioner's Business Activities

Like Trafco, petitioner manufactures recreational vehicles, a process commonly known as van conversions.  Petitioner obtains raw chassis and vans and, through customization, turns them into recreational vehicles.[4]  Atkinson, as president and sole shareholder, guided petitioner with skill and adeptness in a very competitive industry.  By the mid 1980's, petitioner achieved considerable success, generating significant revenues and profits.  During that time, petitioner was the number one van

---

[2]  Compact Equipment Co., Trafco's subsidiary, is a distinct company unrelated to petitioner.

[3]  Because the "Compact Equipment Company" name was still being used by Trafco's subsidiary at the time Atkinson formed petitioner, Atkinson did not initially name petitioner "Compact Equipment Company".

[4]  Raw chassis and vans are simple, operational vehicles lacking any amenities such as sophisticated stereo systems, small kitchens, sofas, etc.

conversion company on the West Coast; nationwide, it ranked seventh or eighth. Petitioner's success was largely due to Atkinson's keen administrative, sales, and marketing techniques.

The Construction of the Carnelian Bay Residence

On November 7, 1983, the Atkinsons purchased a residential property in Carnelian Bay, California, for $550,000 (Carnelian Bay property). Carnelian Bay is located on the north shore of Lake Tahoe, approximately 5 miles from Tahoe City. The Atkinsons purchased the Carnelian Bay property with the intent to live and retire there. Because the Atkinsons planned to build a new home on the Carnelian Bay property (Carnelian Bay residence), the Atkinsons did not immediately relocate to Carnelian Bay.

In 1984, petitioners hired James Woodle (Woodle) to supervise construction of the Carnelian Bay residence and improvements to the Carnelian Bay property. Construction began in 1985 and lasted 16 months. In July of 1986, the Atkinsons moved into their new 4,000-square-foot-home.

Woodle's duties included ordering construction materials and recruiting construction workers necessary for the completion of the Carnelian Bay residence. Woodle paid for small expenditures on construction materials from a checking account established by Atkinson with a local bank. Most of the larger expenditures on construction materials and the wages of the construction workers (construction expenses) were paid directly by petitioner.

Petitioner's Payment of the Construction Expenses

Petitioner's accounts payable clerk (the clerk) processed all invoices forwarded to petitioner. Normally, the clerk would match the invoices to corresponding purchase orders and then prepare checks for the appropriate vendors. If purchase orders did not exist for certain invoices, the clerk forwarded the invoices to petitioner's general manager for approval. After approval, the clerk prepared the checks.

In 1985, petitioner began receiving invoices from various vendors for lumber and for electrical and plumbing fixtures used in the construction of the Carnelian Bay residence (construction invoices). The construction invoices did not have matching purchase orders. As instructed by Atkinson, however, the clerk forwarded the construction invoices to Atkinson instead of the general manager. After Atkinson reviewed the construction invoices and authorized payment, the clerk prepared the checks for the vendors. After the clerk prepared the checks for all invoices (including the construction invoices), the general manager reviewed the purchase orders (if any), invoices, and checks and approved the transactions by signing the checks. After issuing and mailing the checks to the vendors, the general manager or the clerk returned the construction invoices to Atkinson with copies of the checks, a procedure inconsistent with the company's normal bookkeeping process and record retention

policy.

Because petitioner paid the wages of the construction workers, their names were added to petitioner's payroll list pursuant to Atkinson's instructions. As directed by Atkinson, Woodle required the workers to fill out weekly timecards with the number of hours worked. Woodle then forwarded the names of the workers, with the corresponding number of hours worked, to the clerk or petitioner's controller (the controller). Because Woodle was also on petitioner's payroll, Woodle also informed the clerk or the controller of the number of hours he worked for that particular week. A professional payroll processing firm, thereafter, prepared the payroll checks for the general manager's or Atkinson's signature. After the general manager or Atkinson signed the payroll checks, the clerk mailed the payroll checks to a post office box in Lake Tahoe for Woodle to distribute.

Atkinson's Discussions With Petitioner's Accountants

Petitioner hired an accounting firm to prepare its Federal corporate income tax returns (corporate tax returns) for the taxable periods ending March 31, 1985, March 31, 1986, and May 31, 1986. A certified public accountant at the accounting firm, David Dunkin (Dunkin), had primary responsibility for preparing, reviewing, and submitting the corporate tax returns to petitioner. Dunkin also prepared the Atkinsons' 1985 and 1986 Federal individual income tax returns (individual tax returns).

Between November 1984 and January 1985, Dunkin and Edward Fryer from the accounting firm (accountants) met with Atkinson to provide tax advice with regard to petitioner's taxable year ending March 31, 1985, and growing profitability.  At that meeting, Atkinson informed the accountants that during petitioner's board of directors meeting on April 4, 1983, the board of directors established Atkinson's compensation package for petitioner's taxable year ending March 31, 1984, and subsequent taxable years.[5]  In response, the accountants explained to Atkinson that petitioner's compensation deductions for Atkinson's salary and bonuses had to be justified and memorialized.  The accountants advised Atkinson that to demonstrate reasonable compensation for tax purposes, petitioner should establish a formula based on the profitability of the company to determine Atkinson's salary and bonuses.  The accountants also suggested to Atkinson that petitioner maintain minutes for its board of directors meetings.

Following the accountants' advice, petitioner established a formula to determine Atkinson's compensation and created and maintained minutes for petitioner's board of directors meetings. The minutes for the board of directors meetings for March 30,

---

[5]  Petitioner's board of directors consisted of the Atkinsons and a third party.  On June 29, 1984, the board of directors was reduced to two directors consisting of only the Atkinsons.

1985 and 1986, which relate to petitioner's taxable years ending March 31, 1985 and 1986, respectively, show that petitioner's board of directors provided Atkinson with a salary and bonuses. The minutes do not provide any other form of compensation for Atkinson. Petitioner's board of directors never authorized any additional compensation for Atkinson in the form of payments by petitioner for the construction expenses.

Petitioner's Treatment of the Construction Expenses on Its Books and Corporate Tax Returns

To prepare each of petitioner's corporate tax returns, Dunkin's staff visited petitioner's place of business, retrieved all pertinent information from its books and records, and identified questions and issues that needed further addressing. Dunkin's staff, however, did not inspect, review, or audit petitioner's books. Dunkin then met with Atkinson and the controller to inform them of his preliminary findings and to seek answers to the questions and issues raised by his staff and himself. Based on the answers and information provided by Atkinson and petitioner's employees, Dunkin's staff prepared petitioner's corporate tax return. After Dunkin reviewed the corporate tax return, he sent it to Atkinson for his approval and signature.

The total cost of the construction of the Carnelian Bay residence and the improvements to the Carnelian Bay property amounted to more than $1 million. Of that amount, petitioner

paid the following construction expenses during the taxable

periods at issue:

| Taxable Periods Ending | Construction Expenses Paid by Petitioner |
|---|---|
| 3/31/85 | $25,362 |
| 3/31/86 | 495,498* |
| 5/31/86 | 103,941 |

> \* Petitioner paid for other construction expenses. Because Atkinson reimbursed petitioner for those other construction expenses, those amounts are not included in the $495,498.

On its books, petitioner listed the construction expenses as

corporate expenses. Because the construction expenses were

listed on petitioner's books as corporate expenses, Dunkin's

staff deducted the construction expenses on petitioner's

corporate tax returns. The deductions claimed for the

construction expenses were classified mostly as cost of goods

sold. The construction expenses were not classified as

compensation on petitioner's books or corporate tax returns.

On its corporate tax returns, petitioner reported the

following compensation deductions for Atkinson's services and

dividends declared to Atkinson for the taxable periods at issue:

| Taxable Period Ending | Atkinson's Compensation | Dividends Declared |
|---|---|---|
| 3/31/85 | $558,000 | $4,980 |
| 3/31/86 | 532,975 | 4,980 |
| 5/31/86 | 35,530 | -0- |

The Atkinsons' individual tax return for the 1985 calendar year includes two Forms W-2 for Atkinson. The Forms W-2 reflect $559,441 in compensation earned from petitioner. For the 1986 calendar year, the Atkinsons' individual tax return contains one Form W-2 for Atkinson from petitioner in the amount of $561,506.38. The Forms W-2 from petitioner do not reflect as compensation any of the construction expenses.

Petitioner's $69,000 Payment for Lumber

In early 1986, during the preparation of petitioner's corporate tax return for the taxable year ending March 31, 1986, Dunkin's staff questioned the propriety of deducting a $69,000 payment to the Tahoe Lumber Co. for lumber.[6] During a subsequent meeting with Atkinson, Dunkin discussed the $69,000 payment with Atkinson. Atkinson dismissed Dunkin's concerns and instructed Dunkin to treat the $69,000 payment as a deduction on petitioner's corporate tax return.

Around the time that Dunkin questioned the $69,000 deduction, Atkinson began negotiating with Victor Ameye, the chief executive officer of Neoax Corp., for the sale of Atkinson's 100-percent interest in petitioner to Neoax Corp. During the negotiations, Ameye addressed the $69,000 payment. Ameye expressed concern about the use of corporate funds for the

---

[6] The parties stipulate that the payment for the lumber amounted to "approximately $70,000". The record indicates that the payment was closer to $69,000.

construction of the Carnelian Bay residence.  Atkinson alleviated Ameye's concerns by stating that the issue had already been brought to his attention and that he intended to pay back the $69,000 to petitioner.  Atkinson failed to tell Ameye that petitioner incurred and paid many other expenses related to the construction of the Carnelian Bay residence.

A few days later, Atkinson and Dunkin again addressed the $69,000 deduction.  Atkinson instructed Dunkin not to deduct the $69,000 payment on petitioner's corporate tax return.  With Atkinson's approval, Dunkin also established a $69,000 accounts receivable from Atkinson on petitioner's books.  Atkinson was to pay back the loan out of his next bonus.  Atkinson failed to inform Dunkin of the other expenditures incurred by petitioner in the construction of the Carnelian Bay residence.  On March 23, 1986, Atkinson paid petitioner $69,051 with regard to the loan. On May 28, 1986, Neoax Corp. purchased Atkinson's 100-percent interest in petitioner for $3.5 million plus a contingent amount based on petitioner's earnings over the subsequent 3 years.

The Internal Revenue Service's (IRS) Investigation of Petitioners' Corporate and Individual Tax Returns

On May 11, 1988, an IRS special agent and an IRS revenue agent interviewed Atkinson regarding allegations that he had underreported his income on his 1985 and 1986 individual tax returns and that petitioner had improperly deducted the construction expenses on its corporate tax returns for the

taxable periods at issue.  In response to the agents' questions, Atkinson stated that petitioner had not deducted any of the construction expenses on its corporate tax returns.

Atkinson, however, stated that if petitioner paid his personal expenses, he would repay petitioner when petitioner billed him for those amounts.  Atkinson explained that he recollected one instance when petitioner paid $75,000 for lumber to be used in the construction of the Carnelian Bay residence which he subsequently repaid.  Atkinson failed to disclose to the agents that petitioner paid various other construction expenses for which he did not reimburse petitioner.  The IRS subsequently served Atkinson with a summons seeking the construction invoices, but they were never delivered to the IRS.

On September 12, 1991, a Federal grand jury charged Atkinson with violating section 7201 with regard to Atkinson's 1985 and 1986 individual tax returns and section 7206(1) with regard to petitioner's corporate tax returns for the taxable periods at issue.  Atkinson subsequently was convicted.  On December 20, 1991, a Federal district court judge ordered Atkinson to serve 1 year and 1 day in prison, to pay a $500,000 fine, and to pay the taxes owed with regard to the Atkinsons' 1985 and 1986 individual tax returns.

In separate notices of deficiency dated March 14, 1997, respondent determined that petitioner fraudulently deducted the

construction expenses on its corporate tax returns and that the Atkinsons fraudulently failed to include the construction expenses as income on their individual tax returns.[7]  Respondent also determined that petitioner fraudulently deducted numerous charges incurred on its credit cards and that the Atkinsons fraudulently failed to include the credit card charges[8] in income.[9]

Additionally, in the notices of deficiency, respondent imposed additions to tax pursuant to sections 6653(b) and 6661 on petitioners.  As to petitioner, we review respondent's determinations of deficiencies and additions to tax.  As to the Atkinsons, they concede that they committed fraud in failing to report the construction expenses as income on their individual

---

[7]  In addition to the construction expenses already discussed, respondent initially classified certain additional amounts as construction expenses.  Respondent determined that petitioner fraudulently deducted those amounts and that the Atkinsons fraudulently failed to include those amounts in income. The parties are in agreement with regard to the tax consequences of those amounts, and we do not further discuss those additional amounts in this opinion.

[8]  The tax treatment of a portion of the credit card charges is subject to a stipulation by the parties.  Our discussion of the credit card charges is with regard to amounts not subject to the stipulation.

[9]  Because the Atkinsons filed their individual tax returns based on a calendar year and petitioner filed its corporate tax returns on a fiscal yearend (other than the short return year), the amounts listed on the Atkinsons' notice of deficiency with regard to the construction expenses and credit card charges differ from the amounts listed on petitioner's notice of deficiency.

tax returns and that they are liable for the fraud additions to tax with respect to the construction expenses. The Atkinsons also concede that they failed to report the credit card charges as income. Still before us, however, is the issue of whether the fraud additions to tax with regard to the credit card charges should be sustained and whether the Atkinsons are liable for the addition to tax pursuant to section 6661.

OPINION

I. Corporate Fraud

Generally, pursuant to section 6501(a), the Commissioner must assess taxes owed and due on a tax return within 3 years after the return is filed. Section 6501(c)(1), however, provides that if a taxpayer fraudulently files a return, the 3-year statute of limitations under section 6501(a) will not bar the Commissioner from assessing and collecting the taxes owed and due. Additionally, if any part of an underpayment of tax is due to fraud, the Commissioner may impose fraud additions to tax under section 6653(b)(1) and (2).[10]

In order to prove fraud, the Commissioner must show by clear and convincing evidence that the taxpayer underpaid its tax and

_____

[10] Sec. 6653(b)(1) provides for an addition to tax in the amount of 50 percent of the underpayment if any part of the underpayment is due to fraud. Sec. 6653(b)(2) provides for an addition to tax in the amount of 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment which is attributable to fraud.

that some portion of the underpayment is due to fraud.  See sec. 7454(a); Rule 142(b); Laurins v. Commissioner, 889 F.2d 910, 913 (9th Cir. 1989), affg. Norman v. Commissioner, T.C. Memo. 1987-265; Edelson v. Commissioner, 829 F.2d 828, 832 (9th Cir. 1987), affg. T.C. Memo. 1986-223; Petzholdt v. Commissioner, 92 T.C. 661, 698-699 (1989); Mitchell v. Commissioner, T.C. Memo. 1994-242.  If the Commissioner proves an underpayment and that some portion of the underpayment is due to fraud, the bar of the 3-year statute of limitations is lifted with respect to all items on the return, and the Commissioner's deficiency determinations enjoy the usual presumption of correctness, placing the burden on the taxpayer to prove an error.  See Welch v. Helvering, 290 U.S. 111 (1933); Jackson v. Commissioner, 380 F.2d 661, 664 (6th Cir. 1967), affg. T.C. Memo. 1964-330; Colestock v. Commissioner, 102 T.C. 380, 385 (1994); Willits v. Commissioner, 36 B.T.A. 294, 300 (1937); Bencivenga v. Commissioner, T.C. Memo. 1989-239.

Further, the addition to tax under section 6653(b)(1) will apply to the entire underpayment ultimately determined, even though only part of the underpayment is due to fraud.  See Stone v. Commissioner, 56 T.C. 213, 220-221 (1971); Otsuki v. Commissioner, 53 T.C. 96, 105 (1969); Kelley v. Commissioner, T.C. Memo. 1991-324, affd. without published opinion 988 F.2d 1218 (11th Cir. 1993); Cleveland v. Commissioner, T.C. Memo. 1983-299.  The addition to tax under section 6653(b)(2), however,

will apply only to the portion of the underpayment which is attributable to fraud.

A.  Construction Expenses

1.  Underpayment

Respondent must prove by clear and convincing evidence that petitioner underpaid its taxes during each of the taxable periods at issue.  See sec. 7454(a); Rule 142(b).  Respondent contends that the construction expenses paid by petitioner on behalf of Atkinson constitute nondeductible constructive dividends and that petitioner underpaid its taxes when it deducted the constructive dividends.  Petitioner argues that although petitioner improperly classified the construction expenses as cost of goods sold on its tax returns, the construction expenses actually constitute reasonable compensation for services rendered by Atkinson and therefore are deductible by petitioner.

Section 162(a)(1) permits a taxpayer to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as an ordinary and necessary business expense.  See King's Ct. Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 514 (1992); Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); sec. 1.162-7(a), Income Tax Regs.  The taxpayer, however, can deduct payments for personal services only if the payments are intended as compensation.  See King's Ct.

Mobile Home Park, Inc. v. Commissioner, supra at 514; Paula
Constr. Co. v. Commissioner, supra at 1058.

It is a question of fact whether payments are made with an
intent to compensate for services performed. See Whitcomb v.
Commissioner, 733 F.2d 191, 194 (1st Cir. 1984), affg. 81 T.C.
505 (1983); Paula Constr. Co. v. Commissioner, supra at 1058-
1059. The relevant time for determining the requisite intent is
when the purported compensation payment is made, not, for
example, years later when an amended return is filed after the
start of an IRS audit. See King's Ct. Mobile Home Park, Inc. v.
Commissioner, supra at 514; Paula Constr. Co. v. Commissioner,
supra at 1059-1060; Joyce v. Commissioner, 42 T.C. 628, 636
(1964); Drager v. Commissioner, T.C. Memo. 1987-483.

In the instant case, the board of directors established
Atkinson's salary and bonuses during its yearly meetings. The
board of directors, however, did not designate the construction
expenses as compensation for Atkinson's services. The amounts of
the construction expenses were not reported on Atkinson's Forms
W-2 from petitioner. On its books and corporate tax returns,
petitioner accounted for the construction expenses as cost of
goods sold instead of compensation. Further, when questioned by
Dunkin and Ameye about the $69,000 payment for part of the
construction expenses, Atkinson did not claim that these amounts
constituted compensation for services rendered by Atkinson.

Instead, Dunkin, under Atkinson's authority, established an accounts receivable due from Atkinson for the $69,000 payment. The evidence in the record shows that petitioner did not intend for the construction expenses to be compensation for services rendered; thus, we find that the construction expenses constitute nondeductible constructive dividends and that petitioner underpaid its taxes.

### 2. Fraudulent Intent

Along with proving an underpayment, the Commissioner must show that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Powell v. Granquist, 252 F.2d 56, 60-61 (9th Cir. 1958); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). A corporation has no intent separate from those who control it. See King's Ct. Mobile Home Park v. Commissioner, supra at 516. The existence of fraudulent intent by a corporation, therefore, is determined by the acts of its officers. See id.

Fraud is not to be presumed. See Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; Rowlee v. Commissioner, supra at 1123. The existence of fraud is a factual question to be determined from all the facts and circumstances contained in the record. See id. Since direct proof of intent is rarely available, fraud may be proved by

circumstantial evidence and reasonable inferences drawn from the facts.  See Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.

Over the years, courts have developed a nonexclusive list of factors that demonstrate fraudulent intent.  These badges of fraud include:  (1) Understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of income or assets, (6) failure to cooperate with tax authorities, (7) presence of illegal activities, (8) an intent to mislead which may be inferred from a pattern of conduct, (9) lack of credibility of the taxpayer's testimony, (10) filing false documents, and (11) dealing in cash.  See Spies v. United States, supra at 499; Douge v. Commissioner, 899 F.2d 164, 168 (2d Cir. 1990), affg. an order of this Court; Laurins v. Commissioner, 889 F.2d at 913; Bradford v. Commissioner, supra at 307-308; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988).  Although no single factor is necessarily sufficient to establish fraud, the combination of a number of factors constitutes persuasive evidence.  See Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603.  A taxpayer's intelligence, education, and tax expertise are also relevant for purposes of determining fraudulent intent.  See Stephenson v.

Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984); Iley v. Commissioner, 19 T.C. 631, 635 (1952). We evaluate this latter standard in relation to the corporation's officers.

As petitioner's president, sole shareholder, and one of two board directors, Atkinson's actions provide evidence with regard to whether petitioner committed fraud. The Atkinsons purchased the Carnelian Bay property intending to build their home there. Atkinson directed that corporate funds be used to pay for the construction of the Carnelian Bay residence. He instructed petitioner's employees to classify the payments on petitioner's books as corporate expenses related to its operations. Atkinson also instructed his employees to return all construction invoices to him, a procedure inconsistent with petitioner's normal record-keeping practice.

Because petitioner maintained inadequate records, Dunkin classified the construction expenses as cost of goods sold on petitioner's corporate tax returns. When Dunkin questioned the propriety of deducting a $69,000 payment for lumber, Atkinson quickly dismissed Dunkin's objections. Only after Ameye expressed concerns about the $69,000 payment during negotiations for the sale of Atkinson's 100-percent interest in petitioner did Atkinson instruct Dunkin to forgo the $69,000 deduction. Atkinson, however, continued to conceal from Dunkin and Ameye

that various other payments for the construction expenses had been listed on petitioner's books and corporate tax returns as corporate expenses. Atkinson's dealings with petitioner's employees, Dunkin, and Ameye demonstrate an intent to mislead.

In addition, Atkinson lied to the IRS agents. When the IRS agents questioned Atkinson about whether petitioner had improperly deducted the construction expenses, Atkinson stated that the construction expenses had not been deducted on petitioner's corporate tax returns. Further, Atkinson attempted to mislead the IRS agents by stating that petitioner had only paid for part of the construction expenses (the $69,000 payment for lumber) for which he had repaid petitioner. Also, after requested, Atkinson failed to provide the IRS with the construction invoices.

In summary, the evidence shows that Atkinson understated petitioner's taxable income, concealed records and maintained inadequate records, failed to cooperate with tax authorities, and undertook a pattern of conduct with the intent to mislead Dunkin, Ameye, and the IRS. Furthermore, Atkinson is a sophisticated businessman who managed petitioner very successfully, attracting regional and national recognition.

Petitioner argues that Atkinson was not aware that treating the construction expenses as cost of goods sold on petitioner's corporate tax return, instead of declaring corporate dividends,

would result in a lower tax liability. Petitioner, therefore, argues that Atkinson did not have the intent to evade petitioner's taxes. Between November 1984 and January 1985 and before the preparation of petitioner's corporate tax return for the taxable year ending March 31, 1985, Atkinson attended a meeting with petitioner's accountants. At that meeting, the accountants advised Atkinson that petitioner's compensation expenses for Atkinson's services had to be justified for the expenses to be deductible for Federal tax purposes. Petitioner's corporate tax returns reported significant amounts for Atkinson's compensation, and petitioner declared only minimal dividends to Atkinson. These facts show that petitioner paid most of its earnings to Atkinson in the form of compensation instead of dividends to minimize its corporate tax liability. Based on the evidence, we conclude that Atkinson was aware that petitioner could not deduct dividends declared on its corporate tax returns.

Petitioner also argues that even if we find that Atkinson intended to evade petitioner's Federal income taxes, the U.S. Court of Appeals for the Ninth Circuit, to which this case is appealable, requires that the Commissioner prove that "there is no doubt, beyond a frivolous one, regarding the substantive tax treatment of the item at issue". Petitioner cites United States v. Dahlstrom, 713 F.2d 1423, 1427 (9th Cir. 1983), for the proposition that if the tax law is unsettled, a taxpayer lacks

the intent to violate the tax law. Petitioner argues that there is an uncertainty as to whether the payments for the construction expenses should be treated as compensation for services rendered or nondeductible constructive dividends. We disagree. Decisional authority clearly provides that a taxpayer may deduct only amounts intended as compensation for services rendered to the taxpayer. See <u>King's Ct. Mobile Home Park, Inc. v. Commissioner</u>, 98 T.C. at 514; <u>Paula Constr. Co. v. Commissioner</u>, 58 T.C. at 1058.

We, therefore, conclude that respondent has established that petitioner underpaid its taxes with respect to the construction expenses and did so with the intent to evade tax. Because petitioner underpaid its taxes with an intent to evade those taxes, we hold that the 3-year statute of limitations under section 6501(a) does not bar respondent from assessing taxes owed and due. Further, respondent may impose fraud additions to tax under section 6653(b)(1) and (2) with regard to the underpayment associated with the deductions of the construction expenses.

B. <u>Credit Card Charges</u>

1. <u>Presumption of Correctness</u>

Because the presumption of correctness attached to respondent's deficiency determinations, petitioner bears the burden of proving that the credit card charges do not constitute nondeductible constructive dividends. Petitioner has failed to

meet its burden.  Accordingly, respondent's deficiency determinations with regard to the credit card charges are sustained.

2.  Fraud Additions to Tax Pursuant to Section 6653(b)(1) and (2)

Pursuant to section 6653(b)(2), respondent may impose a fraud addition to tax on the portion of the underpayment attributable to fraud.  In this case, respondent provided no evidence that petitioner committed fraud by deducting the credit card charges.  The addition to tax under section 6653(b)(2), therefore, may be imposed on only the underpayment attributable to the deductions of the construction expenses.  Pursuant to section 6653(b)(1), however, the fraud addition to tax applies to the entire underpayment ultimately determined even if respondent manages to prove that only part of the underpayment is due to fraud.  Hence, the fraud addition to tax under section 6653(b)(1) is also applicable to the underpayment resulting from the deductions of the credit card charges.

II.  The Atkinsons' Fraud

A.  1985 Calendar Year

The Atkinsons concede that they committed fraud by not including the construction expenses in income.  Respondent, however, has failed to provide clear and convincing evidence that the Atkinsons committed fraud by not including the credit card charges in income.  As explained above with regard to

petitioner's deductions of the credit card charges, the Atkinsons are liable for the fraud addition to tax under section 6653(b)(1) on the underpayment associated with the failure to include in income the credit card charges.  The Atkinsons are liable for the fraud addition to tax under section 6653(b)(2) only on the underpayment attributable to the fraudulent failure to include in income the construction expenses.

B.  1986 Calendar Year

In 1986, Congress amended section 6653(b), effective for tax returns with a due date after December 31, 1986.  See Tax Reform Act of 1986, Pub. L. 99-514, sec. 1503, 100 Stat. 2085, 2742. Congress consolidated the fraud additions to tax, formerly under section 6653(b)(1) and (2), into section 6653(b)(1).  Through amended section 6653(b)(1), Congress provided that only the portion of the underpayment attributable to fraud would be subject to the fraud additions to tax:

SEC. 6653(b) Fraud.--

(1) In General.--If any part of any underpayment (as defined in subsection(c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to the sum of--

(A) 75 percent of the portion of the underpayment which is attributable to fraud, and

(B) an amount equal to 50 percent of the interest payable under section 6601 with respect to such portion * * *

Under amended section 6653(b)(2), however, once the

Commissioner proves that any portion of the underpayment is attributable to fraud, the entire underpayment is treated as attributable to fraud, except with respect to any portion which the taxpayer establishes is not attributable to fraud.

In the instant case, the Atkinsons concede that they fraudulently failed to include in income the construction expenses. Therefore, pursuant to amended section 6653(b)(2), the underpayment associated with the failure to include in income the construction expenses and the credit card charges is treated as attributable to fraud unless the Atkinsons prove otherwise. The Atkinsons have failed to prove that the failure to include in income the credit card charges is not attributable to fraud. Hence, the fraud additions to tax determined by respondent under amended section 6653(b)(1)(A) and (B) are sustained.

III. Substantial Understatement of Tax

The final issue for decision is whether petitioners are liable for the addition to tax under section 6661. For assessments made after October 21, 1986, section 6661(a) provides for an addition to tax equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of tax. See Omnibus Budget Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951. An understatement is substantial if it exceeds the greater of $5,000 ($10,000 in the case of a corporation) or 10 percent of the tax required to be

shown on the return.  See sec. 6661(b).  The amount of the understatement may be reduced under section 6661(b)(2)(B) for amounts adequately disclosed or supported by substantial authority.  Neither exception under section 6661(b)(2)(B) applies because no amounts were adequately disclosed or supported by substantial authority.

Because the parties have made various concessions, they will have to determine whether petitioners substantially understated their income taxes when making the Rule 155 computations.  For this purpose, the parties will take into account the parties' concessions and our disallowance of petitioner's deductions for the construction expenses and the credit card charges.

In reaching our holdings herein, we have considered all arguments made by petitioners, and to the extent not mentioned above, we find them to be irrelevant or without merit.

To reflect the foregoing,

Decisions will be entered

under Rule 155.